**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PAULA SIMPSON,                                    CASE NO. 2:21-cv-12326

          *Plaintiff*,

     *v.*                                        HON.  MARK A. GOLDSMITH
                                        DISTRICT JUDGE

COMMISSIONER OF SOCIAL                           HON. PATRICIA T. MORRIS
SECURITY,                                        MAGISTRATE JUDGE

         *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON**
**CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 15)**

## I.    RECOMMENDATION

Plaintiff Paula Simpson challenges the Commissioner of Social Security regarding a final decision denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The case was referred to the undersigned for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3). For the reasons below, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 13), and **GRANTING** the Commissioner's motion (ECF No. 15).

## II.    REPORT

### A. Introduction and Procedural History

On August 27, 2018, Plaintiff applied for DIB and SSI, alleging disability as of August 24, 2018 (ECF No.10, PageID.326, 333). She later amended the alleged onset of disability date to July 2, 2018. (*Id.* at PageID.339). She alleges disability due to chronic

1

pain, depression, hypertension, right-sided weakness, an unsteady gait, a history of falling, and chronic arthritis.  (*Id*. at PageID.377).

Following the denial of the claim at the initial level, Plaintiff requested a hearing, held on June 19, 2020 before Administrative Law Judge ("ALJ") Kari Deming.  (*Id*. at PageID.88).  On November 2, 2020, ALJ Deming found that Plaintiff was not disabled. (*Id*. at PageID.67-82).    On July 30, 2021, the Appeals Council denied review of the administrative decision.  (*Id*. at PageID.46-48).  On October 3, 2021, Plaintiff filed for judicial review of the administrative determination.  (ECF No. 1).

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means - and means only - 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See*

*Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

**D. The ALJ's Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since the alleged onset date of July 2, 2018. (ECF No. 10,

PageID.70).   At step two, the ALJ found the following impairments severe:  "cervical degenerative disc disease, status post anterior cervical discectomy and fusion at C3, C4, C5, and C6, and osteoarthritis of the bilateral knees" (*Id*.).   The ALJ found that the conditions of "bursitis, right shoulder; depression; hypertension; and inflammatory conditions of the jaws– osteomyelitis of the left mandible, status post excision of mandibular lesion" were not severe.  (*Id*.).   The ALJ found that Plaintiff's psychological limitations were restricted to mild limitation in concentrating, persisting, or maintaining pace and in adapting or managing herself.  (*Id*. at PageID.70-71)   At step three, she found that none of the impairments met or medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id.* at PageID.71).

The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:[1]

- occasionally stoop, crouch, crawl, kneel, and climb stairs or ramps;

- avoid more than moderate exposure to extreme cold; and

- avoid more than moderate exposure to workplace hazards (such as ropes, ladders, scaffolds, unprotected heights, moving mechanical parts, or hazardous machinery).

(*Id*. at PageID.72).

At step four, the ALJ found that Plaintiff could not perform any past relevant work but citing the VE's testimony, found that she had transferrable skills to the exertionally

---

[1] Under 20 C.F.R. § 404.1567(a-d) *sedentary* work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and  exertionally *heavy* work as "involve[ing] lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work

light position of unit clerk and the sedentary position of receptionist. (*Id*. at PageID.80, 131-32). At step five, the ALJ cited the VE's testimony in support of his determination that Plaintiff could perform a significant number of jobs in the national economy including exertionally light, unskilled work as a mail sorter and routing clerk, (*Id.* PageID.80-81, 135). Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id*. at PageID.82).

### E. Administrative Record

#### 1. The Medical Evidence

March 2018 urgent care records state that Plaintiff sought treatment after falling. (*Id*. at PageID.464). Plaintiff reported that she used a cane. (*Id*. at PageID.464). A review of systems was unremarkable. (*Id*. at PageID.464). She was prescribed Ibuprofen 600 and a topical ointment. (*Id*. at PageID.466). May 2018 records by Purvi Patel, M.D. note that Plaintiff did not experience difficulty walking or climbing stairs. (*Id*. at PageID.502). She demonstrated normal movement in all extremities. (*Id*. at PageID.504). The following month, she denied difficulty walking, dressing, or doing errands alone. (*Id*. at PageID.507). August 2018 records note that the condition of osteomyelitis of the left mandible and an inflammatory jaw condition were resolved following June 2018 surgery. (*Id*. at PageID.471, 483).

Also in August 2018, Dr. Patel completed a medical needs form on Plaintiff's behalf, stating that she needed help performing household chores due to chronic pain, right-side weakness, and an unsteady gait. (*Id*. at PageID.539).

---

requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

On November 16, 2018, Herman Daldin, Ph.D. performed a consultative psychological evaluation on behalf of the SSA, noting Plaintiff's report of hand numbness and the inability to stand or sit for significant periods. (*Id*. at PageID.563). Plaintiff denied receiving mental health treatment. (*Id*.). Dr. Daldin observed that Plaintiff used a cane during the examination but reported the use of a walker and wheelchair. (*Id*. at PageID.564). She appeared slightly depressed without signs of psychosis or a thought disorder. (*Id*.). She was fully oriented with an adequate fund of knowledge. (*Id*.). Dr. Daldin noted Plaintiff's report that her depression was attributable to her physical limitations. (*Id*. at PageID.520). He found "no signs of mental illness" but that she seemed "depressed." (*Id*. at PageID.565). The same day, Cynthia Shelby-Lane, M.D., performed a consultative physical examination, noting Plaintiff's report of pain in both shoulder and "give way" weakness of the knees. (*Id*. at PageID.568). Plaintiff reported that she had been using a cane since 2011 and had a frequent limp and paresthesia of the hands and legs. (*Id*. at PageID.569). Dr. Shelby-Land observed only mild tenderness to palpation of the paracervical area. (*Id*. at PageID.570). She noted Plaintiff did not use the cane during the examination. (*Id*.). She noted "a slight limp on the right side." (*Id*.). She found no evidence of Carpal Tunnel Syndrome ("CTS"). (*Id*. at PageID.571). Plaintiff demonstrated a limited range of forward flexion hip motion but range of motion studies were otherwise normal. (*Id*. at PageID.572-573). She was able to squat, get on and off the examining table, and climb stairs without difficulty. (*Id*. at PageID.574). Dr. Shelby-Lane found that Plaintiff needed use of a cane due to slow walking and a right-sided limp. (*Id*. at PageID.575).

On November 28, 2018, psychologist Dyan Hamton-Aytch, Ph.D. performed a non-examining review of the treating and consultative records, finding that Plaintiff's psychological limitations were limited to mild impairment in the ability to concentrate, persist, or maintain pace and adaptation/ability to care for herself. (*Id*. at PageID.171, 173).

On April 19, 2019, Thomas Flake, M.D. performed a non-examining assessment of Plaintiff's physical abilities, finding that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently; stand or walk for four hours; and sit for six hours. (*Id*. at PageID.176). He found she could push and pull without limitation. (*Id*.). He found that she could climb stairs/ramps, balance, and crouch occasionally but was precluded from kneeling, crawling, and the climbing of ropes, ladders, or scaffolds. (*Id*. at PageID.176-77). Dr. Flake found that Plaintiff should avoid all exposure to hazards such as unprotected heights and "dangerous, moving machinery." (*Id*. at PageID. 177). Dr. Flake concluded that the physical limitations did not preclude Plaintiff's past work as a receptionist. (*Id*. at PageID.179). On July 11, 2019, Sonia Ramirez-Jacobs, M.D. performed a second non-examining assessment, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation. (*Id*. at PageID.195). She found that Plaintiff could climb stairs/ramps, stoop, kneel, crouch, and crawl frequently, and that she could climb ladders/ropes/scaffolds and balance occasionally. (*Id*. at PageID.195-196). She found that Plaintiff should avoid concentrated exposure to hazards such as unprotected heights. (*Id*. at PageID.196).

In August 2019, Dr. Patel completed an assessment of Plaintiff's work-related activities, finding that she could not lift even 10 pounds; stand/walk for two hours in an

8

eight-hour workday; or sit for six.  (*Id*. at PageID.498-99).  He found that her right side pain, neck pain, unsteady gait, need for a cane, and depression limited her ability to push and pull.  (*Id*. at PageID.499).  He found that she could not perform any postural activity due to chronic pain and the use of a cane.  (*Id*.).  He found that her ability to reach was limited to due to neck surgery.  (*Id*. at PageID.500).  He found that she experienced the environmental limitations regarding temperature extremes, humidly, hazards, and airborne contaminants.  (*Id*.).  Dr. Patel's treating records from the same month state that Plaintiff did not experience difficulty walking, climbing stairs, dressing, bathing, or doing errands.  (*Id*. at PageID.620).

September 2019 intake records by Ascension Eastwood Behavioral Health note Plaintiff's report of depression, impaired sleep isolation, anxiety, and poor concentration due to physical pain.  (*Id*. at PageID.588).  She exhibited intact memory with fair judgment and insight.  (*Id*. at PageID.543).  She was diagnosed with moderate depression resulting from psychosocial and occupational factors.  (*Id*. at PageID.590).  The severity of her psychological condition was deemed mild.  (*Id*. at PageID.594).  November 2019 records by Dr. Patel state that Plaintiff did not experience problems climbing stairs, bathing, or dressing.  (*Id*. at PageID.616).  December 2019 records state that Plaintiff could walk using a cane and had a good range of motion.  (*Id*. at PageID.611).  Physical therapy treatment records note Plaintiff's report of up to level "10" knee pain on a scale of 1 to 10.  (*Id*. at PageID.694).  Imaging studies of the knees showed only mild arthritic changes.  (*Id*. at PageID.646).  Therapy records state that Plaintiff was able to walk for 249 feet and was "able to progress to one handrail while descending stairs.  (*Id*. at PageID.710).

January 2020 outpatient counseling records note appropriate thought process and thought content with a depressed mood. (*Id*. at PageID.595). The same month, Plaintiff reported that physical therapy "went great" and that she experienced only a small amount of discomfort. (*Id*. at PageID.603, 717). She declined a recommendation for steroid injections for the knee condition. (*Id*.). She denied problems walking, climbing stairs, dressing, or bathing. (*Id*. at PageID.604). She was able to walk unaided with a normal range of knee motion. (*Id*. at PageID.605). She underwent a steroid injection of the right shoulder. (*Id*. at PageID.606). Imaging studies of the right shoulder did not show arthritic changes. (*Id*. at PageID.606, 631).

February 2020 counseling records show appropriate thought content and an appropriate affect. (*Id*. at PageID.676). A March 2020 MRI of the cervical spine showed moderate spinal canal stenosis with mild to moderate left-sided neural foraminal narrowing at C6-C7 with a central disc herniation at C7-T1 but without significant spinal canal stenosis. (*Id*. at PageID.648-649). The studies showed otherwise mild findings. (*Id*.). Dr. Patel recommended continued conservative treatment. (*Id*. at PageID.667).

July 2020 physical therapy records related to right shoulder and neck pain note Plaintiff's reported of weakness and lack of flexibility. (*Id*. at PageID.722). She reported

10

difficulty washing her hair due to shoulder and neck pain.  (*Id*. at PageID.723).  The following month, she reported up to 40 percent symptom reduction.  (*Id*. at PageID.726).

## 2. Plaintiff's Testimony

 Plaintiff offered the following testimony:

 She was born June 27, 1964.  (*Id*. at PageID.90).  She stood 5' 3" and weighed 120 pounds.  (*Id*. at PageID.95).  She held a valid driver's license but relied on her caregiver for transportation.  (*Id*. at PageID.96).  She had used a permanent handicap parking permit since undergoing neck surgery in February 2011.  (*Id*. at PageID.96-97).

Plaintiff finished two years of college and then completed a year-and-a-half course in medical transcribing.  (*Id*. at PageID.97).  She lived by herself in a three-story house.  (*Id*.).  She slept on the main floor of the house.  (*Id*. at PageID.98).  Her caregiver cooked, helped her dress, washed clothes, and helped her groom and dress herself.  (*Id*.).  She was able to feed herself.  (*Id*. at PageID.99).

She stopped working in August 2018 due to neck pain.  (*Id*.).  Following 2011 neck surgery, Plaintiff worked as a receptionist but her job duties also included training security personnel and creating work schedules.  (*Id*. at PageID.102).  The receptionist position exposed her to cold air in the winter.  (*Id*. at PageID.103).  Plaintiff currently supported herself with monthly food stamps.  (*Id*. at PageID.105).  She received Medicaid coverage through the state.  (*Id*.).  At the time of the hearing, she was "about to get set out of [her] home." (*Id*.).

In response to questioning by her attorney, Plaintiff reported that at the time she quit work, complications from the neck surgery limited her to looking forward.  (*Id*. at

PageID.107).  At the same time, due to severe leg cramps, it took her three hours to prepare for work.  (*Id.*).  She also experienced right-sided tiredness causing her to drag her right leg causing her to fall at work.  (*Id.*).

Plaintiff used a walker or cane to ambulate.  (*Id.* at PageID.110-11).  She was referred to a neurologist who found that she did not require surgery.  (*Id.* at PageID.112).  She experienced tingling of the right arm and right little due to neck problems.  (*Id.* at PageID.114).  She had been scheduled for physical therapy for right shoulder problems but the therapy had been canceled due to the pandemic.  (*Id.* at PageID.114).  She could not sit for more than two minutes or walk for less than one.  (*Id.* at PageID.115).  She was unable to lift/carry more than three pounds.  (*Id.*).

Plaintiff's primary care doctor prescribed her Zoloft she was receiving mental health counseling for depression.  (*Id.* at PageID.116).  Her isolation during the COVID-19 pandemic exacerbated her psychological symptoms.  (*Id.* at PageID.118-119).  She stated that she would "commit suicide" if she were further prevented from counseling and efficacious medication.  (*Id.* at PageID.119).  She groomed herself sporadically since the beginning of the pandemic.  (*Id.*).  She spent her waking hours watching television, which increased her depression and fear of contracting COVID-19.  (*Id.* at PageID.120).  She required reminders to take her prescribed medication.  (*Id.* at PageID.119).

### 3.  The Vocational Expert's Testimony

The VE stated that her testimony would be based on the Dictionary of Occupational Titles ("DOT"), Selected Characterizations of Occupations ("SCO"), Census Bureau information, Department of Labor statistics, and a number of

electronic databases.  (*Id*. at PageID.122-123).   She classified Plaintiff's past relevant work as a composite of a supply room clerk/unit clerk (semiskilled, medium) and later, the composite position of unit clerk/receptionist (semiskilled, medium).  (*Id*. at PageID.127-29).   The ALJ then posed the following set of modifiers to the VE, describing a hypothetical individual of Plaintiff's age, education, and work history:[L]ight work . . . she can occasionally stoop, crouch, crawl, kneel, and climb stairs or ramps.  Avoid more than moderate exposure to workplace hazards, including such things as ropes, ladders,  scaffolds, unprotected heights, moving mechanical parts, or hazardous machinery. . . . [A]void more than moderate exposure to extreme cold.  (*Id*. at PageID.130-31).

The VE stated that the above limitations would preclude returning to Plaintiff's past relevant composite jobs but would allow the transfer of her job skills to the semiskilled, sedentary position of receptionist (within the health care/medical field) ("DOT") code 209.687-026 (77, 500 positions in the national economy).  The VE found further that the hypothetical individual could perform the unskilled, light work of a mail sorter, DOT code 222.687-022 (104,000) and routing clerk, DOT code 222.587-038 (35,000).  (*Id*. at PageID.135).  The VE testified that the use of a handheld assistive device would preclude the jobs of mail sorter and routing clerk but would not preclude the work of a receptionist.  (*Id*. at PageID.136).

In response to questioning by Plaintiff's attorney, the VE testified, in effect, that significant concentrational limitations would preclude all semiskilled work.  (*Id*. at PageID.138).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2018).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)   Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)   Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)   Licensed audiologist for impairments of hearing loss, auditory

14

processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. §§ 404.1502(a), 416.902(a). (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* §§ 404.1502(d), 416.902(a).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* §§ 404.1502(e), 416.902. "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* §§ 404.1520c(a), 416.920(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider

several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* §§ 404.1520c(c)(3), 416.920c(c)(3). This factor will include the analysis of:

(i)    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)   Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)  Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

> (v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* §§ 404.1520c(c)(4), 416.920c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* §§ 404.1520c(c)(5), 416.920c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this

requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative edical findings in [each] case record." *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of [these sections], as appropriate." *Id.* The regulations reiterate that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of these sections) and consistency (paragraph (c)(2) of these sections) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3)

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* §§ 404.1520c(d), 416.920c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c" or 416.920c. *Id.* §§ 404.1520b(c), 416.920b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

    (i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

    (iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead

of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity
        prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-
        vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends
        when we conduct a continuing disability review[.]

*Id.* §§ 404.1520b(c), 416.920b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* §§ 404.1504, 416.904. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* §§ 404.1502(f), 416.902(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also

20

be shown by observable facts that can be medically described and evaluated." *Id.* §§ 404.1502(g), 416.902(g).   Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*; §§ 404.1502(c), 416.902(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* §§ 404.1529(a), 416.929(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that

21

you are disabled." *Id.* §§ 404.1529(a), 416.929(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA notes that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* §§ 404.1529(c)(3), 416.929(c). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.* "Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical

sources, and observations by our employees and other persons[.]" *Id.*   The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

> (i)      [D]aily activities;
>
> (ii)     The location, duration, frequency, and intensity of . . . pain;
>
> (iii)    Precipitating and aggravating factors;
>
> (iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)      Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)     Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."   *Id.* §§ 404.1530(a), 416.930(a).   Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* §§ 404.1530(b), 416.930(a).   Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1)      The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2)      The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3)      Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* §§ 404.1530(c), 416.930(c).

### G.  Arguments and Analysis

#### 1.  The Step Five Determination

In arguing for remand, Plaintiff contends that the ALJ crafted an under-restrictive RFC and that the ALJ erred by declining to adopt Dr. Patel and Dr. Shelby-Lane's opinions that she required the use of a cane.  (ECF No. 13, PageID.783).  She takes issue with the ALJ's rationale for rejecting both sources' findings on this point, arguing that while the ALJ found Dr. Shelby-Lane's opinion regarding cane use "'inconsistent with other evidence in the file,'" it was wholly consistent with Dr. Patel's findings.  (*Id.*) citing (ECF No. 10, PageID.78.  Plaintiff points out further that while the ALJ cited January 2020 physical therapy records to support the conclusion that she did not require the use of a cane, the physical therapy records actually show an increase of movement with cane and wall support.  (*Id.* at PageID.786-87) citing (ECF No. 10, PageID.716).  She argues that the ALJ's failure to provide a well-supported rationale for finding that she did not require a cane mandates a remand for further proceedings.  She also argues that her need for a hand-held device precludes work as a receptionist as found by the ALJ at step four of the sequential analysis.  (*Id.* at PageID.789).

In turn, the Commissioner argues that substantial evidence supports the conclusion that Plaintiff did not require the use of a cane and that the ALJ provided an adequate

24

explanation for declining to include the need for a cane in the RFC.   (ECF No. 15, PageID.800-02).   The Commissioner notes that even if substantial evidence does not support RFC's lack of reference to a cane or other assistive device, the error is harmless, and the need for a cane would not change the ALJ's alternative, step four determination that Plaintiff possessed job skills from her past relevant work transferrable to the position of receptionist where the use of a cane would not preclude her job duties.   (*Id*. at PageID.804-805).

In reply, Plaintiff restates her argument that the conclusion that she did not need a cane is not well supported or explained.   (ECF No. 16, PageID.809-10).   She also argues that the "[t]he VE was not presented with a "hypothetical individual" who required the use of a handheld assistive device when asked whether [her] skills were transferable." (*Id*. at PageID.811).

In crafting the RFC, The ALJ must consider the claimant's alleged physical, mental, and environmental restrictions. 20 C.F.R. §§ 404.1545(b)-(d), 416.945(b)-(d); SSR 96-8p, 1996 WL 374181, at *5.   "Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing." *Delgado v. Commissioner of Soc. Sec.,* 30 F. App'x. 542, 547-548 (6th Cir. 2002) (internal citations omitted) ("[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.").

Here, acknowledging Plaintiff's lower extremity limitations, the ALJ restricted Plaintiff to exertionally light work with occasional stooping, crouching, crawling, kneeling,

and climbing stairs or ramps and the avoidance of more than moderate exposure to extreme cold and work-related hazards.  (ECF No. 10, PageID.72).  The RFC does not include the need for an assistive device.

Plaintiff is correct that the ALJ's finding that an assistive device was not required is critical to her step five finding that Plaintiff could perform a range of exertionally light work.  (*Id.* at PageID.81).  The VE testified that the need for an assistive device would preclude both the semiskilled work of a unit clerk (based on Plaintiff's transferrable job skills from her former work) and the unskilled, light work of a mail sorter and routing clerk.  (*Id.* at PageID.136).  Plaintiff, born June 27, 1964, was 54 years old at the time of her application.  Under the Medical-Vocational Rules, an individual between the ages of 50 and 55 is categorized as an individual "closely approaching advanced age." A finding that she was unable to perform any of her past relevant work or use transferrable skills in another position and was limited to unskilled, sedentary work would direct a finding of disability.  20 C.F.R. part 404, subpart P, App. 2, Rule 201.14.  During the relevant period, Plaintiff passed her 55th birthday.  Medical-Vocational Rule 202.06 directs a finding of disability for an individual 55 or over (advanced age) who is unable to perform any past relevant work, did not possess transferrable skills, and is limited to exertionally light or sedentary, unskilled work.

However, the ALJ's finding that Plaintiff did not require the use of an assistive device is well-supported and explained.  The ALJ acknowledged Plaintiff's testimony that she required the use of a cane and/or walker.  (ECF No. 10, PageID.73).  She provided a fulsome discussion of the evidence supporting the conclusion that an assistive device was

26

not required, citing Dr. Patel's October 2018 records showing no muscle aches, arthralgias, or joint pain.  (*Id*. at PageID.74).  She noted that Plaintiff used a cane at a May 2019 appointment but had a normal musculoskeletal exam.  (*Id*.).  She acknowledged November and December 2019 reports of edema of the knee and the periodic use of a cane, but noted that following December 2019 physical therapy, Plaintiff was able to walk unaided and declined a recommendation for steroid injections of the knees.  (*Id*. at PageID.75).

As to the opinion evidence, the ALJ noted that Plaintiff used a cane during a November 2018 consultative psychological exam but did not require the use of a cane during Dr. Shelby-Lane's physical examination and testing the same day.  (*Id*. at PageID.76-77).  The ALJ acknowledged Dr. Shelby-Lane's conclusion that Plaintiff required the use of a cane but found it "unpersuasive" for the following reasons: (1) Plaintiff was able to walk unaided following January 2020 physical therapy, and (2) Plaintiff was able to complete Dr. Shelby-Lane's examination (including postural and range of motion testing) without the use of a cane.  (*Id*. at PageID.78).  The ALJ rejected Dr. Patel's finding that Plaintiff was unable to perform even sedentary work for the same reasons.  (*Id*.).  The ALJ instead adopted Dr. Ramirez-Jacob's finding that Plaintiff did not require an assistive device.  (*Id*. at PageID.79).  Dr. Ramirez-Jacob's finding, without more, constitutes substantial evidence in support of the ALJ's conclusion.

Plaintiff's argument that the ALJ's determination is not well-supported and not adequately explained, is not well taken.   She takes issue with the ALJ's finding that Drs. Shelby-Lane and Dr. Patel's opinions were inconsistent with other portions of the record, arguing that the two sources' opinions were "consistent with each other." (ECF No. 13,

PageID.736).  However, while the two sources made consistent findings, those findings are contradicted by other portions of the record including normal exam findings, Plaintiff's observed ability to walk without the use of a cane, and Dr. Ramirez-Jacob's opinion that Plaintiff did not require the use of a cane.

Plaintiff's contention that the ALJ mischaracterized the therapy records in support of her finding that an assistive device was not required is also unavailing.  While she claims that her improvements in therapy were conditioned on the use of a cane or leaning against a wall, the actual records indicate the use of wall or cane support was one in a series of exercises successfully used to build strength.  (*Id*. at PageID.716).  In any case, substantial evidence supports the conclusion that Plaintiff did not require the ongoing use of cane, given that following therapy, the treating records state that she was able to walk unaided. (*Id*. at PageID.605).   While Plaintiff cites *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 527–28 (6th Cir. 2014) (reversal mandated where mischaracterizations of the record were coupled with the ALJ's failure to mention the findings of two consultative physician), the present ALJ neither mischaracterized the record nor ignored the opinion evidence. Contrary to Plaintiff's claim, the ALJ addressed the evidence contradicting her findings and provided a "coherent" explanation for her conclusions.  (ECF No. 13, PageID.788).

### 2. The Step Four Finding

Even assuming that the finding Plaintiff did not require the use of an assistive device was not adequately supported, the ALJ's alternative, step four finding that Plaintiff had transferrable skills from her past relevant work to perform the sedentary job of receptionist supports the finding of non-disability.   The VE's testimony that the job of a medical

receptionist could be performed by an individual using an assistive device moots the arguments pertaining to the step five determination.   It is well-settled that "courts are not required to "'convert judicial review of agency action into a ping-pong game' where 'remand would be an idle and useless formality.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654, 147 Soc. Sec. Rep. Serv. 24, 2009 WL 3162262 (6th Cir. 2009) (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6 (1969)).   The Medical-Vocational guidelines directing a finding of disability, as discussed above, are applicable only where the individual is unable to perform her past work *and* does not possess transferrable skills. 20 C.F.R. part 404, subpart P, App. 2 (Disability under the Medical-Vocational guidelines predicated on the inability to perform a claimant's past relevant work). When such individuals "have no past work experience or can no longer perform vocationally relevant past work *and have no transferable skills*, a finding of disabled ordinarily obtains." *Id.* (emphasis added).

Plaintiff contends that the "[u]se of an assistive device can eliminate light work or significantly erode the occupational base."  (ECF No. 13, PageID.789); *see* SSR 96-9p, 1996 WL 374185,*7 (June 2, 1996) ("occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities ... may be significantly eroded").   But the VE stated explicitly that the use of a handheld device while performing the medical receptionist position was "not preclusive of the actual job tasks." (ECF No. 10, PageID.136).  The ALJ underscored this testimony by noting that "[e]ven if I had limited the claimant to a sedentary exertional level with a hand-held assistive device, the [VE] testified that this job is still within the RFC." (*Id*. at PageID.81,

n.1).   Plaintiff's reliance on *Kowalewski v. Comm'r of Soc. Sec.*, No. CV 15-13325, 2017 WL 976725, at *8 (E.D. Mich. Mar. 14, 2017) ("[Q]uestion remains as to whether Plaintiff's use of a cane would interfere with the performance of even sedentary work with a sit/stand option") is unavailing.   Unlike *Kowalewski*, the present RFC does not include a sit/stand option.   And unlike *Kowalewski*, the VE in this case stated unambiguously that the medical receptionist position could be performed with the use of a hand-held device.

Finally, the undersigned notes that the VE's testimony regarding transferability of skills properly took into account Plaintiff's status as an individual closely approaching advanced age at the time of the applications:

> To find that an individual who is age 55 or over and is limited to sedentary work exertion has skills transferable to sedentary occupations, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry . . . . Individuals with these adverse vocational profiles cannot be expected to make a vocational adjustment to substantial changes in work simply because skilled or semiskilled jobs can be identified which have some degree of skill similarity with their [past relevant work]. In order to establish transferability of skills for such individuals, the semiskilled or skilled job duties of their past work must be so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation.

SSR 82-41, 1982 WL 31389, at *5–6 (1982).   The VE was clearly mindful of these requirements, testifying that the position of "receptionist within the health care/medical field" was a "lateral transfer[] within the same industry" from Plaintiff's previous work with "very little, if any, vocational   adjustment . . ." (ECF No. 10, PageID.133).   Her finding of 77,500 positions as a medical receptionist in existence in the national economy represents an adequate number of jobs to support the non-disability finding.   *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 2022 WL 2965629, at *3 (6th Cir. 2022) (finding that

"32,000 suitable jobs" in the national economy is a "'significant'" number as required by 42 U.S.C. § 423(d)(2)(A).  Plaintiff's argument that the need for an assistive device or the requirement for "closely related" transferable positions eroded the job numbers below a significant number is directly contradicted by the VE's testimony.

Because both the step four and five findings are supported by the record and adequately explained, the ALJ's determination of non-disability should remain undisturbed.

### 3. Conclusion

For these reasons, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 13), and **GRANTING** the Commissioner's motion (ECF No. 15).

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 22, 2022                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge